## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BRADY CAMPAIGN TO PREVENT GUN VIOLENCE,<br><br>     Plaintiff,<br><br>      v.<br><br>KENNETH L. SALAZAR, Secretary of the United States Department of the Interior, *et al.*<br><br>     Defendants. | Civil Action No. 08-2243 (CKK) |
| NATIONAL PARKS CONSERVATION ASSOCIATION, *et al.*,<br><br>     Plaintiffs,<br><br>      v.<br><br>KENNETH L. SALAZAR, Secretary of the United States Department of the Interior, *et al.*<br><br>     Defendants. | Civil Action No. 09-013 (CKK) |

## MEMORANDUM OPINION
(March 19, 2009)

Approximately 25 years ago, the Department of the Interior implemented regulations that generally prohibited possession of firearms in national parks unless they were "packed, cased or stored in a manner that [would] prevent their ready use."  48 Fed. Reg. 30,252 (June 30, 1983), codified at 36 C.F.R. § 2.4(a)(2).  A similar regulation applied to firearms in national wildlife refuges.  *See* 49 Fed. Reg. 18,444 (April 30, 1984), codified at 50 C.F.R. § 27.42(e).  These firearm restrictions are no longer in place.  On December 10, 2008, the Department of the

Interior promulgated a final rule that allows persons to possess concealed, loaded, and operable firearms in national parks and wildlife refuges in accordance with the laws of the state in which the national park or wildlife refuge is located:

> a person may possess, carry, and transport concealed, loaded, and operable firearms within a [national park or national wildlife refuge] in accordance with the laws of the state in which the [national park or national wildlife refuge], or that portion thereof, is located, except as otherwise prohibited by applicable Federal law.

73 Fed. Reg. 74,966, 74,972 (Dec. 10, 2008), amending 36 C.F.R. § 2.4, 50 C.F.R. § 27.42 (hereinafter, the "Final Rule"). Prior to issuing the Final Rule, the Department of the Interior did not prepare an environmental assessment or an environmental impact statement pursuant to the National Environmental Protection Act ("NEPA"), 42 U.S.C. § 4331, *et seq.*

Plaintiffs Brady Campaign to Prevent Gun Violence ("Brady") and National Parks Conservation Association (along with two other Plaintiff organizations, "NPCA"),[1] have brought suit against Secretary Kenneth Salazar, in his official capacity as Secretary of the United States Department of the Interior ("DOI"), and numerous other governmental entities and officials (collectively, "Defendants").[2] Plaintiffs assert, *inter alia*, that Defendants failed to consider the Final Rule's environmental impacts in violation of NEPA and multiple other Congressional

---

[1] The other two Plaintiff organizations are the Coalition of National Park Service Retirees and the Association of National Park Rangers.

[2] Pursuant to Federal Rule of Civil Procedure 25(d), the Court has automatically substituted Kenneth Salazar as the successor to the originally-named lead Defendant, Dirk Kempthorne. The other named Defendants are the United States Department of the Interior, the National Park Service, the United States Fish and Wildlife Service, Mary A. Bomar, in her official capacity as Director of the National Park Service, H. Dale Hall, in his official capacity as Director of the Fish and Wildlife Service, and R. Lyle Laverty, in his official capacity as Assistant Secretary of the Interior for Fish, Wildlife and Parks.

statutes.[3]

The lynchpin of Defendants' response is that the Final Rule has *no* environmental impacts–and that Defendants were not required to perform any environmental analysis–because the Final Rule only authorizes persons to possess concealed, loaded, and operable firearms in national parks and wildlife refuges, and does not authorize persons to discharge, brandish, or otherwise use the concealed, loaded, and operable firearms.  In other words, the Final Rule has no environmental impacts according to Defendants because the Final Rule does not *authorize* any environmental impacts.  By relying on this tautology, Defendants (1) abdicated their Congressionally-mandated obligation to evaluate all reasonably foreseeable environmental impacts, whether authorized by the Final Rule or not, and (2) ignored (without sufficient explanation) substantial information in the administrative record concerning environmental impacts, including (i) Defendants' own long-standing belief under the previous regulations that allowing only inoperable and stored firearms in national parks and wildlife refuges was necessary to safeguard against certain risks to the environment and (ii) the almost universal view among interested parties that persons who possess concealed, loaded, and operable firearms in national parks and wildlife refuges will use them for any number of reasons, including self-defense against persons and animals (all of which suggests that the Final Rule will have *some* impact on the environment).

---

[3] The Complaint filed by Brady and the Amended Complaint filed by NPCA collectively assert claims under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, the National Environmental Protection Act, 42 U.S.C. § 4331 *et seq.*, the Organic Act, 16 U.S.C. § 1 *et seq.*, the National Wildlife Refuge System Administration Act, 16 U.S.C. § 668dd, *et seq.*, the National Historic Preservation Act, 16 U.S.C. § 470 *et seq.*, the Endangered Species Act, 16 U.S.C. § 1531, *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

Currently pending before the Court is Plaintiffs' Motion for a Preliminary Injunction to enjoin implementation of the Final Rule.  Because the Court finds that the Final Rule is the product of Defendants' astoundingly flawed process, the Court holds that Plaintiffs are highly likely to prevail on the merits of their NEPA claims.[4]  The Court also holds that Plaintiffs have met their burden to show a likelihood of irreparable harm, the absence of significant harm to other interested persons or entities, and that the public interest weighs in favor of preliminary injunctive relief.  Having balanced all of these considerations and found that they weigh in favor of issuing a preliminary injunction, the Court shall GRANT Plaintiffs' Motion for a Preliminary Injunction.

In reaching this decision, the Court emphasizes that, despite many of the arguments raised by the parties, intervenor-movants, and amici curiae, this case is *not* a platform for resolving disputes concerning the merits of concealed weapons or laws related to concealed weapons that are appropriately directed to the other branches of government.  The Court is bound to consider only whether Defendants have complied with Congress' statutes and regulations, and *not* whether Defendants have made wise judgments in any normative sense.  Accordingly, the Court expresses no view as to the merits of any laws or regulations related to concealed weapons or firearms generally.

## I.  BACKGROUND

*A.     Factual Background*

As explained above, previous regulations pertaining to national parks and wildlife refuges

---

[4] As the Court finds that success on Plaintiffs' NEPA claims is highly likely, the Court declines to reach Plaintiffs' other claims for purposes of their Motion for a Preliminary Injunction.

generally prohibited possession of firearms unless they were unloaded and packed, cased, or stored in a manner that prevented their ready use.  48 Fed. Reg. 30,252 (June 30, 1983); 49 Fed. Reg. 18,444 (April 30, 1984).  These regulations were "designed to ensure public safety and provide maximum protection of natural resources by limiting the opportunity for unauthorized use of weapons . . . while providing reasonable regulatory relief for persons living within or traveling through park areas."  48 Fed. Reg. at 30,265.[5]  As reflected in the Administrative Record, this view persisted among Defendants until recently.  *See, e.g.*, A.R. 339 (11/29/06 National Park Service Briefing Statement) (repeating the justification for firearm restrictions in national parks and adding that "[m]ost weapons carried for the protection from wildlife are not adequate for that purpose.  Untrained individuals attempting to protect themselves from dangerous animals often exacerbate the situation").

Defendants' views changed.  On December 14, 2007, forty-seven United States Senators wrote to the Secretary of the Interior asking to have these restrictions lifted.  73 Fed. Reg. 74,966, 74,967 (Dec. 10, 2008).  Four additional United States Senators made a similar request on February 11, 2008.  *Id.*[6]  The DOI "chose to address this issue" on April 30, 2008, by proposing a new rule to allow persons to possess concealed, loaded, and operable firearms in national parks and wildlife refuges to the extent permitted in any state park or wildlife refuge in the state in

---

[5] Plaintiffs note, and Defendants do not dispute, that there were also various other types of firearm restrictions in place prior to implementation of these regulations, including a restriction on firearm possession in Yosemite National Park dating back to 1897.  *See* Pls.' Mot. at 4.

[6] Although omitted in the Final Rule, it appears that United States Senators Dianne Feinstein and Daniel K. Akaka joined with two members of the United States House of Representatives, Norman D. Dicks and Raul M. Grijalva, to submit a letter during the comment period opposing any change to the existing regulations.  *See* A.R. 11 (Draft Final Rule).

which the federal park or wildlife refuge was located:

> an individual will be able to possess, carry, and transport concealed, loaded, and operable firearms within a [national park or wildlife refuge] in the same manner, and to the same extent, that a person may lawfully possess, carry, and transport concealed, loaded and operable firearms in any [state park or state wildlife refuge] in the state in which the [national park or wildlife refuge], or that portion thereof, is located.

73 Fed. Reg. 23,388 (Apr. 30, 2008). The DOI explained that the purpose of this proposed rule was to better respect the rights of states, forty-eight of which "provide for the possession of concealed firearms by their citizens," a larger number than when the previous regulations were promulgated. *Id.* Accordingly, the DOI explained that the regulations "should be amended to defer to this development in State law." *Id.* at 23,389.

Conspicuous by its absence, however, was any indication that the previously-recognized "public safety" and "protection of natural resources" concerns had been alleviated over time. *Id.* Instead, the DOI simply acknowledged "its obligations under NEPA to assess the impact of any Federal action significantly affecting the quality of the human environment, health, and safety," and noted that it was "currently working to determine the appropriate level of NEPA assessment and documentation that will be required for promulgation of this regulation." *Id.* at 23,390.

The proposed rule requested public comments until June 30, 2008, a date that was later extended by an additional thirty days. 73 Fed. Reg. at 74,967. In total, the DOI received approximately 125,000 public comments on the proposed rule. *Id.* Significantly–and as described in greater detail below–many of the comments suggested that allowing persons to possess concealed, loaded, and operative firearms in national parks and wildlife refuges would result in the use of those firearms, particularly for self-defense. *See, e.g.*, A.R. 1927 ("I [] go

6

back packing and would like to be able to carr[ry] my fire arm [sic] with me for possible wild

animal attack"); A.R. 5609 ("for those of us who have conceal[ed] carry permits, we carry

[firearms] for the protection of our families and self from those who would do us harm.  We are

not looking to shoot anyone unless we are forced to in order to protect our family").  The DOI

formed a working group to analyze these comments and to provide responses in the Final Rule.

73 Fed. Reg. at 74,968-74,970.

On December 10, 2008, the DOI published the Final Rule, making one significant

modification from the proposed rule.  Whereas the proposed rule permitted persons to possess

concealed, loaded, and operative firearms if permitted in any *state park or wildlife refuge* in

which the federal park or wildlife refuge was located, the Final Rule authorizes persons to

possess concealed, loaded, and operative firearms if permitted in accordance with *state law*

*generally*:

> a person may possess, carry, and transport concealed, loaded, and operable
> firearms within a [national park or national wildlife refuge] in accordance with the
> laws of the state in which the [national park or national wildlife refuge], or that
> portion thereof, is located, except as otherwise prohibited by applicable Federal
> law.

73 Fed. Reg. at 74,971.  The DOI made this change because "the reference to 'similar state lands'

in the proposed rule was ambiguous and led to confusion as to what rules would apply to

particular Federal park areas and national wildlife refuges."  *Id.* at 74,969.

In terms of its obligations under NEPA, the DOI explained that the Final Rule did not

raise any environmental concerns that required evaluation:

> The [DOI] has analyzed the [Final Rule] under NEPA and determined that the
> action is subject to a categorical exclusion under applicable regulations.  First, the
> [Final Rule] is in the nature of a legal change to existing rules that will not have

7

any actual effects on the environment.  And second, the [DOI] has determined that no 'extraordinary circumstances' exist which would prevent the proposed action from being classified as categorically excluded.  This decision is fully described in [the DOI's] decision document dated November 18, 2008 . . . .

*Id.* at 74,971.  The DOI's Decision Memorandum, in turn, reflects the DOI's tautological reasoning that the Final Rule will have no environmental impacts because it does not authorize any environmental impacts:

the [DOI] has concluded that the final rule will not have any actual effects on the environment . . . the amendment does not allow visitors to fire or discharge the firearms in any way, brandish the weapon in the view of others, or use the firearm in any other way.  In this regard, the [Final Rule] does not authorize any *actual* impacts on the environment, and thus meets the test for a categorical exclusion under relevant regulations and judicial precedent.

A.R. 200 (11/18/08 Decision Memorandum) (emphasis in original).[7]  The Final Rule became effective on January 9, 2009.  *See* 73 Fed. Reg. at 74,966.

> B.      Procedural Background

Brady filed a lawsuit on December 30, 2008.  NPCA filed a separate lawsuit on January 6, 2009, along with a Motion for a Preliminary Injunction.  *See NPCA v. Salazar*, Civ. A. No. 09-013, Docket No. [4].  Brady then filed its own Motion for a Preliminary Injunction on January 9, 2009, incorporating by reference NPCA's memorandum of law and facts.  *See Brady v. Salazar*, Civ. A. No. 08-2234, Docket No. [5].  Because both motions rely on the same underlying memorandum of law and facts, the Court shall refer throughout this Memorandum Opinion to "Plaintiffs' Motion for a Preliminary Injunction."

The Court held a conference call on January 8, 2009, with counsel representing all

---

[7] For purposes of clarity and ease of reference, the Court shall cite directly to the DOI's Decision Memorandum throughout this Memorandum Opinion as "Defs.' Decision Mem.," rather than using citations to the Administrative Record.

Plaintiffs and Defendants to discuss a briefing schedule for Plaintiffs' Motion for a Preliminary Injunction.  All parties agreed that "they would suffer no prejudice by extending the briefing on the preliminary injunction motion beyond the schedule provided by Local Civil Rule 65.1," and the Court "also [found] that no prejudice would result."  Min. Order dated Jan. 9, 2009.  After a discussion on the record, the Court agreed to adopt the schedule proposed by the parties that allowed Defendants to respond to Plaintiffs' Motion for a Preliminary Injunction by January 30, 2009, and would result in the full briefing of the motion no later than February 13, 2009.

On January 20, 2009, (*i.e.* after the conference call with the Court but before the date by which Defendants were to respond to Plaintiffs' Motion for a Preliminary Injunction), President Barack Obama took office.  Defendants moved for a two-week extension of the briefing schedule "to provide the new administration that took office . . . an opportunity to consider the issues raised by Plaintiffs' motions."  *See* Unopposed Mot. for Extension at 2 (Jan. 27, 2009).  The Court granted the motion to extend the schedule, allowing Defendants until February 13, 2009, to file a response to Plaintiffs' Motion for a Preliminary Injunction, and resulting in the full briefing of the motion no later than February 27, 2009.

Pursuant to the amended schedule set by the Court, Defendants submitted the complete administrative record on February 5, 2009, and submitted an Opposition to Plaintiffs' Motion for a Preliminary Injunction on February 13, 2009 ("Defs.' Opp'n").  Brady and NPCA filed separate Replies in support of the Motion for a Preliminary Injunction on February 23, 2009 ("Brady Reply" and "NPCA Reply," respectively).  Pursuant to the amended schedule set by the Court, Defendants filed a consolidated Sur-Reply on February 27, 2009 ("Defs.' Sur-Reply").

The Court also received motions from two organizations seeking to intervene as

9

Defendants.  The Mountain States Legal Foundation ("MSLF") filed a Motion to Intervene as a

Defendant in both cases on January 23, 2009.  The National Rifle Association ("NRA") filed a

Motion to Intervene as a Defendant in both cases on January 28, 2009, and February 25, 2009,

respectively.  During the pendency of the motions, both the MSLF and the NRA filed

Oppositions to Plaintiffs' Motion for a Preliminary Injunction.  Defendants took no position with

respect to the Motions to Intervene, and Plaintiffs in both cases opposed intervention.  For

reasons the Court shall articulate by separate Order, the Court has allowed both the MSLF and

the NRA to intervene as of right as Defendants in the above-captioned cases.[8]  Accordingly, the

Court has considered the Oppositions to Plaintiffs' Motion for a Preliminary Injunction filed by

the MSLF and the NRA.

 The Court also received motions from several organizations seeking to participate as

amici curiae. The Friends of Acadia and Maine Citizens Against Handgun Violence (collectively,

"FOA") filed an Unopposed Motion for Leave to Participate as Amicus Curiae in both cases on

February 6, 2009.  Safari Club International ("SCI") also filed an Unopposed Motion for Leave

to Participate as Amicus Curiae in both cases on February 17, 2009.   The Court granted both

motions.  Accordingly, the Court has reviewed FOA and SCI's amici briefs for purposes of

ruling on Plaintiffs' Motion for a Preliminary Injunction.

 Finally, each of the parties has moved to submit extra-record evidence in support of

---

 [8] As the Court's separate Order shall indicate, the MSLF and the NRA may intervene
subject to limitations prohibiting them from raising claims outside the scope of those raised by
the original parties or from raising collateral issues.  *See Fund for Animals, Inc. v. Norton*, 322
F.3d 728, 738 n.11 (D.C. Cir. 2003) (describing with approval a district court's use of restrictions
on intervenors to facilitate the efficient resolution of the proceedings and to prevent undue delay
or prejudice).

various arguments.  Brady filed a partially opposed motion to submit various declarations "in support of its position that it has standing and will suffer irreparable harm from Defendants' actions," which the Court granted by Minute Order dated March 4, 2009.  Similarly, NPCA filed a partially opposed motion to submit a supplemental declaration, which the Court granted-in-part and denied-in-part by Minute Order dated March 19, 2009.  Finally, Defendants filed a Motion to submit an "extra-record document" that "evidences Federal Defendants' interpretation of the regulations at issue."  *See* Defs.' Mot. to Submit Doc. at 2.  Even though the Court finds that consideration of this document is unnecessary to resolve the issues associated with Plaintiffs' Motion for a Preliminary Injunction, Plaintiffs did not oppose its submission and the Court granted the motion by Minute Order dated March 19, 2009.

Based on the foregoing, Plaintiffs' Motion for a Preliminary Injunction is fully briefed and ripe for decision.

## II.  LEGAL STANDARDS

### A.      *Preliminary Injunction*s

To obtain preliminary injunctive relief, a moving party must show:  (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction.  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  In applying this four-factored standard, district courts may employ a sliding scale under which a particularly strong showing in one area can compensate for weakness in another.  *Id*.  Accordingly, "[i]f the showing in one area is particularly strong, an injunction may issue even if the showings in other areas are rather

weak." *Id.* (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995)). Nevertheless, the D.C. Circuit has advised that a movant must demonstrate "'at least some injury' for a preliminary injunction to issue . . . [because] 'the basis of injunctive relief in federal courts has always been irreparable harm . . . .'" *Id.* (quoting *CityFed*, 58 F.3d at 747; *Sampson v. Murray*, 415 U.S. 61, 88 (1974)).

Defendants raise an argument (albeit in a footnote) that this standard for a preliminary injunction has been circumscribed by the Supreme Court's decision in *Winter v. Natural. Res. Def. Council, Inc.*, __ U.S. __ , 129 S. Ct. 365 (2008). *See* Defs.' Opp'n at 11 n.8. *See also* MSLF Opp'n at 3 (discussing the application of *Winter*). The Court disagrees. In *Winter*, the Supreme Court held that the Court of Appeals for the Ninth Circuit had applied an erroneous legal standard by affirming a district court's preliminary injunction when the plaintiff had only shown a "possibility" of irreparable harm and where the district court had made almost no attempt to analyze the balance of equities and the public interest. *See* 129 S. Ct. at 375, 378. The Supreme Court found that this standard was too "lenient," and reaffirmed that a preliminary injunction should issue only when "irreparable injury is *likely* in the absence of an injunction." *Id.* (emphasis in original). The Court had no occasion to examine the D.C. Circuit's precedents allowing a plaintiff's strong showing in one area to compensate for weakness in another. *Id.* at 392 (Ginsburg, J., Dissenting) ("courts have evaluated claims for equitable relief on a 'sliding scale,' sometimes awarding relief based on a lower likelihood of harm when the likelihood of success is very high . . . This Court has never rejected that formulation, and I do not believe it does so today."). In any event, because the D.C. Circuit's precedents require a plaintiff to show that "it would suffer irreparable injury if the injunction were not granted," *Chaplaincy*, 454 F.3d

12

at 297, the Court finds that the D.C. Circuit's sliding-scale standard remains viable even in light

of the decision in *Winter*.[9]

      *B.*     *Administrative Procedure Act*

      Although the Court has discussed Plaintiffs' claims in the context of NEPA, that statute

does not provide a private right of action.  *See Karst Envtl. Educ. & Prot., Inc. v. Envtl. Prot.*

*Agency*, 475 F.3d 1291, 1295 (D.C. Cir. 2007).  Accordingly, Plaintiffs assert their NEPA claims

under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*.

      Under the APA, the Court sets aside an agency action that is "arbitrary and capricious, an

abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706.  Compliance

with NEPA, as well as its procedures related to environmental evaluations, are properly analyzed

under the "arbitrary and capricious standard."  *Nat'l Trust for Historic Pres. in the U.S. v. Dole*,

828 F.2d 776, 781 (D.C. Cir. 1987).  The scope of review under this standard is well-established:

> the agency must examine the relevant data and articulate a satisfactory
> explanation for its action including a rational connection between the facts found
> and the choice made.  In reviewing that explanation, [the court] must consider
> whether the decision was based on a consideration of the relevant factors and
> whether there has been a clear error of judgment . . . Normally, an agency rule
> would be arbitrary and capricious if the agency has relied on facts which Congress

---

[9] Intervenor-Defendant NRA argues that "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held," NRA Opp'n at 2 (quoting *Chaplaincy*, 454 F.3d at 297), and that the Final Rule became effective on January 9, 2009.  It is unclear what the NRA hopes to achieve with this argument.  Plaintiffs filed their initial Motion for a Preliminary Injunction on January 6, 2009, prior to the effective date of the Final Rule.  During the conference call with the Court on January 8, 2009, all parties agreed to an extended briefing schedule to allow a more fulsome briefing on the relevant issues without prejudice to any party.  While the NRA is correct that a preliminary injunction, at this point, would not prevent the Final Rule from reaching its effective date, a preliminary injunction could enjoin implementation or enforcement of the amendments to the regulations at issue.  Thus, the parties' relative positions could be maintained until resolution of Plaintiffs' claims on the merits.

has not intended it to consider, entirely failed to consider an important aspect of
the problem, offered an explanation for its decision that runs counter to the
evidence before the agency, or is so implausible that it could not be ascribed to a
difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

(1983) (citations and internal quotations omitted).  This standard of review is deferential to the

agency, and the Court is not entitled to substitute its judgment for that of the agency.  *Citizens to*

*Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).  Nevertheless, while deferential,

"courts are not obliged to stand aside and rubber-stamp their affirmance of administrative

decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional

policy underlying a statute."  *Nat'l Labor Relations Bd. v. Brown*, 380 U.S. 278, 290 (1965).  *See*

*also McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir.

2004) (holding that the "Court will not defer to the agency's conclusory or unsupported

assertions").

## III.  DISCUSSION

Although Plaintiffs assert claims for relief under numerous statutes, the Court need only

reach their principal argument that Defendants should have, but did not, perform an

environmental assessment or environmental impact statement pursuant to the National

Environmental Policy Act.  NEPA, the "basic national charter for protection of the environment,"

40 C.F.R. § 1500.1(a), requires federal agencies to take a "hard look" at the environmental

consequences of their projects *before* taking action.  42 U.S.C. § 4332(C); *Marsh v. Or. Natural*

*Res. Council*, 490 U.S. 360, 374 (1989).  NEPA "requires that agencies assess the environmental

consequences of federal projects by following certain procedures during the decision-making

process." *City of Alexandria, Va. v. Slater*, 198 F.3d 862, 866 (D.C. Cir. 1999).

NEPA has twin aims. "First, it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action." *Baltimore Gas & Elec. Co. v. Natural. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) (internal quotation omitted). "Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Id.* Accordingly, NEPA's "mandate is essentially procedural." *City of Alexandria, Va.*, 198 F.3d at 866 (internal quotation omitted); *North Slope Borough v. Andrus*, 642 F.2d 589, 599 (D.C. Cir. 1980) (explaining that NEPA requirements are essentially procedural and a court should not substitute its own policy judgment for that of the agency). "NEPA merely prohibits uninformed–rather than unwise–agency action." *Robertson v. Methow Valley Citizen's Council*, 490 U.S. 332, 351 (1989).

"The major 'action-forcing' provision of NEPA is the requirement that 'all agencies of the Federal government' prepare a detailed environmental analysis for 'major Federal actions significantly affecting the quality of the human environment.'" *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 146 (D.C. Cir. 1985) (quoting 42 U.S.C. § 4332(C); S. Rep. No. 91-296, 91st Cong., 1st Sess. 19 (1969)). This analysis is called an Environmental Impact Statement ("EIS"). *See* 42 U.S.C. § 4332(C).

An EIS is not required if the agency makes a determination based on a more limited document, an Environmental Assessment ("EA"), that the proposed action would not have a significant impact on the environment. *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 81 (D.D.C. 2006) (citing 40 C.F.R. §§ 1501.4, 1508.13). "The EA is to be a 'concise public document' that '[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an

[EIS].'" *Dep't of Transp. v. Pub. Citizen,* 541 U.S. 752, 757 (2004) (quoting 40 C.F.R. § 1508.9(a)).  "If, pursuant to the EA, an agency determines that an EIS is not required under applicable [regulations issued by the Council on Environmental Quality], it must issue a 'finding of no significant impact' ("FONSI"), which briefly presents the reasons why the proposed agency action will not have a significant impact on the human environment."  *Id.* at 757-58 (citing 40 C.F.R. §§ 1501.4(e), 1508.13).

Of particular significance to the present litigation, an agency need not prepare an EIS or even an EA if it finds that its proposed action is subject to a "categorical exclusion."  A "categorical exclusion" is defined as:

> a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations (§ 1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required.

40 C.F.R. § 1508.4.  The terms within this definition are defined broadly.  A "cumulative impact" is defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or person undertakes such other actions."  *Id.* § 1508.7.  The term "effects" not only includes direct effects (those "caused by the action and occur at the same time and place"), but also indirect effects (those "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable").  *Id.* § 1508.8.  Moreover, the type of "effects" that are contemplated by this definition include:

> ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative.  Effects may

also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

*Id.*

When an agency finds that its proposed action falls within a categorical exclusion, the agency must then determine whether there are any "[e]xtraordinary circumstances" that nevertheless require the agency to perform an environmental evaluation.  43 C.F.R. § 46.215. Such extraordinary circumstances include actions that have

(a) significant impacts on public health or safety,

(b) significant impacts on . . . park, recreation or refuge lands,

(c) highly controversial environmental effects, or

(d) highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks.

*Id.* § 46.215(a)-(d).

Agencies must comply with the procedural requirements of NEPA, and the decision to forego production of an EIS or EA in favor of a categorical exclusion is subject to judicial review under the arbitrary and capricious standard of review.  *Nat'l Trust for Historic Pres. in the U.S.*, 828 F.2d at 781; *Back Country Horseman of Am. v. Johanns*, 424 F. Supp. 2d 89, 98 (D.D.C. 2006) ("an agency's 'decision to classify a proposed action as falling within a particular categorical exclusion will be set aside only if a court determines that the decision was arbitrary and capricious'") (quoting *Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1023 (10th Cir. 2002)).

With this background in place, the Court shall turn to Plaintiffs' showing with respect to

the four elements necessary to obtain a preliminary injunction.

      *A.    Plaintiffs' Have Established a High Likelihood of Success on the Merits*

      The DOI promulgated the Final Rule without conducting an EIS or an EA, taking the

position that the Final Rule was subject to a categorical exclusion for regulations of a purely legal

nature:

> [p]olicies, directives, regulations, and guidelines: that are of an administrative,
> financial, legal, technical, or procedural nature; or whose environmental effects
> are too broad, speculative, or conjectural to lend themselves to meaningful
> analysis and will later be subject to the NEPA process, either collectively or case-
> by-case.

43 C.F.R. § 46.210(i).[10]

      The DOI's November 18, 2008 Decision Memorandum describes four reasons why it

believed this categorical exclusion applied to the Final Rule.  *See* Decision Mem. at 3-4.  <u>First</u>,

the DOI believed that the Final Rule was "strictly [a] legal amendment" that "amends existing

regulations to allow visitors to carry concealed, loaded, and operable firearms in federal park

units and wildlife refuges to the extent that they could lawfully do so under non-conflicting state

law."  *Id.* at 3.  <u>Second</u>, the DOI concluded that the Final Rule "will not have any actual effects

on the environment" because "the [F]inal [R]ule does not authorize any *actual* impacts on the

---

      [10] Plaintiffs' Motion for a Preliminary Injunction argues that the DOI improperly relied on
the language of this categorical exclusion after it had been amended in October 2008.  *See* Pls.'
Mot. at 17-18.  Whereas the categorical exclusion previously applied to regulations of a legal
nature "*and* whose environmental effects are too broad," the categorical exclusion was amended
to apply to regulations of a legal nature "*or* whose environmental effects are too broad."
(emphasis added).  The DOI explained that this change was made to correct "an unintended
drafting error," 73 Fed. Reg. 61292 (Oct. 15, 2008), and Plaintiffs do not suggest that this
change, published in a proposed rule on January 2, 2008, was procedurally improper.  As
Defendants correctly note, Plaintiffs "cite no authority for [the] proposition that an agency cannot
rely on a recently amended regulation after it has become effective."  Defs.' Opp'n at 24 n.18.

environment." *Id.* (emphasis in original).  Third, the DOI explained that the Bureau of Land

Management ("BLM") and the United States Forest Service already authorize the possession of

concealed firearms on public lands in accordance with state laws, and that "available data does

not suggest that visitors to these lands use legally permitted firearms for poaching or illegal

shooting, or that there is additional danger posed to the public from lawfully carried concealed

firearms." *Id.* at 4 (citing various reports, studies, and surveys).  Fourth, the DOI emphasized

that the Final Rule "explicitly maintains existing prohibitions on poaching, target shooting, and

other illegal uses of firearms, including laws against brandishing a firearm in public,"

prohibitions that the DOI "expects visitors to obey." *Id.*

     Plaintiffs argue that none of these reasons justify the DOI's failure to assess the

environmental impacts of the Final Rule.  Specifically, Plaintiffs argue that the DOI avoided

"study or analysis of how many loaded guns are likely to be carried into National Parks and how

they will be used," and "just assum[ed] that none of the guns will ever be fired . . . ."  Pls.' Mot.

at 20.  Brady also points out that Defendants "never explain why it is crucial to reverse a

longstanding public safety rule to allow people to carry loaded firearms that they supposedly will

never use, or on what basis they presume that those carrying firearms will never brandish or use

them."  Brady Reply at 20.

     The Court agrees with Plaintiffs that the DOI's Decision Memorandum reflects a

significant misunderstanding of the obligations imposed by NEPA.  Under that statute, the DOI

was required to take a "hard look" at the environmental consequences of the Final Rule *before* its

implementation.  *Marsh*, 490 U.S. at 374.  This burden is greater than simply examining whether

environmental impacts are *authorized* by the Final Rule – the DOI was required to consider all

direct, indirect, and cumulative impacts that were *foreseeable* as a result of the Final Rule.  *See*

40 C.F.R. § 1508.8 (defining "indirect effects" to include those that are "reasonably

foreseeable").

　　　　For example, in *Friends of the Earth, Inc. v. United States Army Corps of Engineers*, the

defendant (the "Corps") performed two EA's in connection with a proposal to construct three

casinos on large floating barges along Mississippi's St. Louis Bay and the Bay of Biloxi.  109 F.

Supp. 2d 30, 32-33 (D.D.C. 2000).  The Corps found that there would be no significant impact

on the environment as a result of the construction, in part based on a finding that indirect

"growth-inducing effects" were "'highly speculative and indefinite.'"  *Id.* (quoting *Sierra Club v.*

*Marsh*, 769 F.2d 868, 878 (1st Cir. 1985)).  The plaintiffs argued, in contrast, that the Corps was

required under NEPA to evaluate "the significant upland development adjacent to the casino

barges and the inevitable secondary development that would result from the casinos."  *Id.* at 40.

　　　　The court agreed with the plaintiffs, finding that "[i]ndirect impacts need only to be

'reasonably foreseeable' to require an assessment" under NEPA.  *Id.* at 41.  The court reviewed

the administrative record and found that it established "that increased growth in the area is the

only reasonable prediction of what will occur if the casinos are built," and emphasized that "the

Corp's own leadership has acknowledged that increased development resulting from the casinos

is a concern."  *Id.* at 41.  Accordingly, it made no difference whether the casinos themselves were

the source of these effects, provided the construction of the casinos would give rise to these

foreseeable effects.

　　　　The analysis in *Friends of the Earth, Inc.*, which reaffirmed an agency's obligation to

evaluate all reasonable foreseeable environmental impacts and not just those authorized by an

agency action, is also reflected (ironically) in one of two cases cited by the DOI in its Decision

Memorandum seeking to justify reliance on a categorical exclusion.  *See* Decision Mem. at 3

(citing *Sierra Club v. Bosworth*, 510 F.3d 1016 (9th Cir. 2007)).[11]  In that case, the Ninth Circuit

Court of Appeals found that the United States Forest Service failed to properly assess the

environmental significance of a categorical exclusion for certain fuel reduction projects in all

national forests in the United States.  510 F.3d at 1027.  In so finding, the court held that the

Forest Service "failed to consider adequately the unique characteristics of the applicable

geographic areas, the degree to which effects on the quality of the environment were

controversial or the risks were unknown . . . and whether there existed cumulative impacts from

other related actions."  *Id.*  Although the Forest Service analyzed various data prior to

establishing the categorical exclusion, the court found that its evaluation was "inadequate as a

cumulative impacts analysis because it offer[ed] only conclusory statements that there would be

no significant impact[s]."  *Id.* at 1029.  The court further rejected the Forest Services's approach

for assessing foreseeable environmental impacts in which the Forest Service "summarily

conclude[d], without citing hard data to support its conclusion, that there were no cumulative

impacts" because "this is precisely the reason why a global cumulative impact analysis must be

performed."  *Id.*

        The DOI made the same error in this case that the defendants made in *Friends of the*

*Earth, Inc.* and *Sierra Club*.  Rather than performing an evaluation to ascertain the extent of any

foreseeable environmental impacts, the DOI simply assumed there were none because the Final

---

        [11] The second of the two cases, *California v. Norton*, 311 F.3d 1162, 1172 (9th Cir.
2002), concerns the extraordinary circumstances that prevent an agency from relying on a
categorical exclusion.

Rule did not authorize any impacts. *See* Decision Mem. at 2 ("the final rule does not authorize any *actual* impacts on the environment, and thus meets the test for a categorical exclusion under relevant regulations and judicial precedent") (citing *Sierra Club v. Bosworth*, 510 F.3d 1016 (9th Cir. 2007)). This Court's function is to "ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *City of Olmsted Falls, Ohio v. Fed. Aviation Admin.*, 292 F.3d 261, 269 (D.C. Cir. 2002). The scope of this review includes an inquiry into whether the agency has made its decision based on "a consideration of the relevant facts" and whether it has "failed to consider an important aspect" of the issues associated with its decision. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. Defendants' failure to apply the correct standard by which to consider environmental impacts–by examining what the Final Rule authorized as opposed to the foreseeable consequences that would occur as a result of the Final Rule–is sufficient by itself to render the DOI's decision to invoke a categorical exclusion arbitrary and capricious.[12] While this error alone would provide Plaintiffs with a high likelihood of success on the merits of their NEPA claims, this improper standard was only the first of several procedural errors committed by the DOI.

The DOI also ignored, without any explanation, its own long-standing belief under the previous regulations that firearm restrictions in national parks and wildlife refuges were necessary to "ensure public safety and provide maximum protection of natural resources by

---

[12] Were the Court to adopt Defendants' logic, a rule that amended regulations to allow persons to dump containers of toxic waste in national parks could qualify for a categorical exclusion as an amendment of a "legal nature," provided the rule also required that the containers not leak or otherwise have an impact on the environment.

limiting the opportunity for unauthorized use of weapons." 48 Fed. Reg. at 30,265. Public safety

and protection of natural resources are indisputably encompassed within the definition of

"environmental impacts" that must be considered pursuant to NEPA. *See* 40 C.F.R. § 1508.8

(defining environmental impacts to include "ecological, . . . aesthetic, historic, cultural,

economic, social, or health," effects, "whether direct, indirect, or cumulative").[13] Nonetheless,

Defendants point to nothing in the Administrative Record to show why they believe their

previous environmental concerns have subsided over time or why they are, in fact, no longer

concerns.

Plaintiffs emphasize that the DOI failed to distinguish its previous position that gun

restrictions were a "basic mechanism . . . to protect the natural and cultural resources of the parks

[and wildlife refuges] and to protect visitors and property within the parks." Pls.' Mot. at 26-27

(quoting 48 Fed. Reg. at 30252). Plaintiffs argue that the DOI's "only mention of the prior rules

was a description of how they operated," Pls.' Mot. at 26, and that this brief mention was

insufficient to justify a reversal of its previous position. *Id.* at 25.

The D.C. Circuit has repeatedly explained that an agency's unexplained "180 degree turn

away from [precedent is] arbitrary and capricious," and that an agency's decision "to reverse its

position in the face of a precedent it has not persuasively distinguished is quintessentially

arbitrary and capricious." *La. Pub. Serv. Comm'n v. Fed. Energy Regulatory Comm'n*, 184 F.3d

892, 897 (D.C. Cir. 1999) (citing *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 57) ("[a]n agency's

view of what is in the public interest may change, either with or without a change in

---

[13] For this reason, the Court rejects out of hand Intervenor-Defendant NRA's argument
that NEPA "has no application here." NRA Opp'n at 3.

circumstances.  But an agency changing its course must supply a reasoned analysis").  "'[T]he

core concern underlying the prohibition of arbitrary and capricious agency action' is that agency

'ad hocery' is impermissible."  *Ramaprakash v. Fed. Aviation Admin. & Nat'l Transp. Safety

Bd.*, 346 F.3d 1121, 1130 (D.C. Cir. 2003) (quoting *Pacific N.W. Newspaper Guild, Local 82 v.

Nat'l Labor Relations Bd.*, 877 F.2d 998, 1003 (D.C. Cir. 1989)).  *See also ANR Pipeline Co. v.

Fed. Energy Regulatory Comm'n*, 71 F.3d 897, 901 (D.C. Cir. 1995) ("Where an agency departs

from established precedent without a reasoned explanation, its decision will be vacated as

arbitrary and capricious.").

Relying on this guidance, lower courts have repeatedly inquired into whether an agency

has adequately explained a change in its position in light of the obligations imposed by NEPA.

*See, e.g.*, *Greater Yellowstone Coal. v. Kempthorne*, 577 F. Supp. 2d 183, 189 (D.D.C. 2008)

("[r]eview of an agency action is more demanding where the challenged decision stems from an

administrative about-face"); *Fund for Animals v. Norton*, 294 F. Supp. 2d 92, 107 (D.D.C. 2003)

(invalidating a rule permitting 950 snowmobiles in national parks each day because NPS failed to

adequately distinguish its previous position that "snowmobiling so adversely impacted the

wildlife and resources of the Parks that all snowmobile use must be halted").

Here, the Court finds that the DOI failed to adequately distinguish its previous position

that firearm restrictions were necessary to protect against environmental harms involving "public

safety" and "protection of natural resources."  Based on its Decision Memorandum, the DOI

appears to have been singularly motivated to lift the restrictions that prevented persons from

carrying concealed, loaded, and operable firearms in national parks and wildlife refuges based on

considerations of federalism:

> [w]e believe that in managing parks and refuges we should, as appropriate, make
> every effort to give the greatest respect to the democratic judgments of State
> legislatures with respect to concealed firearms.  As stated in the proposed rule,
> Federal agencies have a responsibility to recognize the expertise of the States in
> this area, and Federal regulations should be developed and implemented in a
> manner that respects 'state prerogatives and authority.'

73 Fed. Reg. at 74,967 (quoting Executive Order 13132 (Aug. 10, 1999)).

Even if one were to accept this explanation,[14] the DOI's federalism concerns are unrelated

to, and have no effect on, any environmental impacts associated with the Final Rule.  Defendants

have not suggested otherwise, simply assuming (as set forth above), that the Final Rule will have

no environmental impacts because none have been authorized, even though Defendants took the

position until recently that firearm restrictions contained in the previous regulations were

necessary to protect against environmental harms.  This change of course without a reasoned

explanation is the quintessential example of an arbitrary and capricious action.  Defendants were

required to provide a reasoned explanation for the Final Rule that addressed all foreseeable

environmental impacts – including those that the DOI has *already* foreseen, as reflected in the

previous regulations.

---

[14] There are substantial reasons to question both the logic and efficacy of the DOI's
explanation.  According to Brady, there are twenty-five states "that prohibit the transport of
concealed and loaded guns within their own parks." *See* Brady Reply at 13 & n.12.  Given that
the Final Rule lifts firearm restrictions in national parks or wildlife refuges in accordance with
state law generally (as opposed to the laws applied to the state parks and wildlife refuges located
in those states), the Final Rule appears to permit concealed firearms in the national parks or
wildlife refuges of some states that do not allow concealed firearms in their own state parks or
wildlife refuges.  This discrepancy is highlighted by the FOA Amicus Brief, which explains that
the Final Rule creates precisely this anomaly in the state of Maine.  *See* FOA Amicus Br. at 4.
Accordingly, in FOA's view, the Final Rule "actually allow[s] the national government to
impose its will on states, despite long-standing state laws to the contrary." *Id.*  While Defendants
object to this characterization of the Final Rule, they do not fully dispute that this discrepancy
exists.  *See* Defs.' Sur-Reply at 4.  In any event, the Court need not resolve the merits of
Defendants' federalism explanation to rule on Plaintiffs' Motion for a Preliminary Injunction.

Finally, there is a third flaw associated with the DOI's decision to invoke a categorical

exclusion.  Despite the DOI's obligation to take a "hard look" at the environmental impacts

associated with the Final Rule, and even though an EA is the appropriate vehicle to initially

assess such environmental impacts, the DOI's Decision Memorandum proceeds to highlight

various information in the administrative record that, according to the DOI, demonstrates that the

Final Rule will not lead to any environmental impacts:

> the BLM and the U.S. Forest Service currently authorize the possession of
> concealed firearms consistent with the laws of the state in which they are located.
> The available data [which is not defined or further explained] does not suggest
> that visitors to these lands use legally permitted firearms for poaching or illegal
> shooting, or that there is additional danger posed to the public from lawfully
> carried concealed firearms.

Decision Mem. at 4 (citing *Firearms and Violence: A Critical Review* 6 (Charles F. Wellford et

al. eds., 2004)).  The DOI's Decision Memorandum then references "a number of academic

studies and surveys demonstrat[ing] that individuals authorized to carry concealed firearms are

*less likely* than the general public to commit a violent crime or engage in a personal confrontation

with a firearm."  *Id.* (emphasis in original).  Defendants' Opposition to Plaintiffs' Motion for a

Preliminary Injunction repeats this information without further elaboration.  *See* Defs.' Opp'n at

13-14.

The deficiencies with the DOI's analysis are numerous.  First, the conclusion that there

will be *no* environmental impacts associated with the Final Rule is inconsistent with the almost

universal view reflected in the administrative record (including among *Defendants*) that allowing

concealed, loaded, and operable firearms in national parks and wildlife refuges will result in

persons using them, particularly for self-defense:

26

**From the DOI:**

Issue 5: Visitors should not carry a concealed firearm for self-defense because NPS and FWS law enforcement officers are more than adequate to protect individuals from harm:

Response 5: The Department believes that NPS and FWS law enforcement officers work hard and perform valiant public service in their respective capacities.  We also recognize that the NPS and FWS together employ approximately 3,000 full and part-time law enforcement officers who are responsible for patrolling and securing millions of acres of land, a substantial portion of which is remote wilderness.  In these circumstances, NPS and FWS law enforcement officers are in no position to guarantee a specific level of public safety on their lands, and cannot prevent all violent offenses and crimes against visitors.

73 Fed. Reg. at 74,969.

**From Intervenor-Defendant NRA:**

[d]efensive gun use is very common, with as many as 2.5 million defensive gun uses per year.  Gun use is more effective than any other means for preventing the completion of robberies and assaults, and people who use guns in self-defense are significantly less likely to be injured during a robbery or assault than are victims who respond in any other way.

NRA Mot. to Intervene, Ex. A at 3 (6/30/08 Comments on Proposed Rule).

**From Amicus Curiae SCI:**

sportsmen and women are direct beneficiaries of the Final Rule.  Many hunters and fisherman, or their guides, carry a loaded pistol as protection against large predators, including bears and wolves.  A preliminary injunction would take away the ability of sportsmen and women to defend themselves from wildlife in remote areas of National Parks and Refuges.

SCI Amicus Br. at 13.

**From every living former Director of the National Park Service:**

we are concerned about efforts to overturn the regulations controlling firearms in the national parks . . . These rules . . . are essential to park rangers in carrying out their duties of protecting park resources and wildlife, and in assuring the safety of

visitors to the parks . . . The regulation was crafted to be as narrowly restrictive as possible while assisting park personnel to prevent unlawful killing of wildlife.

A.R. 1218 (4/3/08 Letter to D. Kempthorne).

**From various individuals submitting comments to the DOI:**

I [] go back packing and would like to be able to carr[ry] my fire arm [sic] with me for possible wild animal attack.

I urge you to change the rules on carrying guns into the National Parks, for those of us who have conceal[ed] carry permits, we carry [firearms] for the protection of our families and self from those who would do us harm.  We are not looking to shoot anyone unless we are forced to in order to protect our family.

A.R. 1927 (6/16/08 Email Comment), A.R. 56009 (8/7/08 Public Submission).

**From Plaintiff NPCA:**

that defensive shootings–whether justified or not, whether hit or miss–will occur is not reasonably open to debate.  Scores of individuals with concealed carry permits have made their intent to use weapons in perceived self-defense in the National Parks crystal clear.

NPCA Reply at 5.  Despite this view, there is no indication in the administrative record that Defendants evaluated (1) the likely number of concealed, loaded, and operative firearms that would be brought into national parks and wildlife refuges, (2) the likely number of instances the firearms would be discharged or otherwise used (including for defensive purposes), and (3) the likely effect on the environment.

The failure to fully consider an environmental impact has long been held to be arbitrary and capricious under the procedures set forth in NEPA.  For example, in *Foundation on Economic Trends v. Heckler*, the D.C. Circuit examined whether the National Institute of Health ("NIH") had performed the appropriate level of environmental review prior "to approving the deliberate release of genetically engineered, recombinant-DNA-containing organisms into the

open environment." 756 F.2d 143, 145 (D.C. Cir. 1985). Although NIH performed two EA's,

the Court found that NIH's consideration fell "far short of the NEPA requirements." *Id.* at 153.

The Court explained that "dispersion of genetically altered organisms are uncertain. Some

observers believe that such dispersion would affect the environment and the climate in harmful

ways." *Id.* The Court then explained that NIH's only consideration of these environmental

impacts consisted of a single sentence: "[a]lthough some movement of bacteria toward sites near

treatment locations by insect or aerial transport *is possible*, the numbers of viable cells

transported has been shown to be very small." *Id.* at 153 (emphasis in original). The Court

found that NIH "failed to consider the possible environmental impact from dispersion of

genetically altered bacteria," and "[a]n environmental assessment that fails to address a

significant environmental concern can hardly be deemed adequate for a reasoned determination .

. . ." *Id.* at 153-54. The D.C. Circuit then stated, in no uncertain terms, that ignoring possible

environmental impacts, or explaining in conclusory form that they are not of concern, is

insufficient under NEPA:

> Ignoring possible environmental consequences will not suffice. Nor will a mere
> conclusory statement that the [environmental impacts] will be small . . . Nor is it
> sufficient for the agency merely to state that the environmental effects are
> currently unknown. Indeed, one of the specific criteria for determining whether
> an EIS is necessary is 'the degree to which the possible effects on the human
> environment are highly uncertain or involve unknown risks.'

*Id.* at 154-55 (citing 40 C.F.R. § 1508.27(b)(5). Like the NIH in *Heckler*, the DOI arbitrarily and

capriciously ignored the environmental impacts that would result from the use of these firearms.

Defendants repeatedly argue in their briefs that no assessment of firearm use was

necessary because the use is based on "speculation." *See, e.g.*, Defs.' Opp'n at 13. The DOI's

explanation is woefully insufficient because NEPA requires an agency to consider environmental

impacts even if the effects are not entirely certain.  "Simply by focusing the agency's attention on

the environmental consequences of a proposed project, NEPA ensures that important effects will

not be overlooked or underestimated only to be discovered after resources have been committed

or the die otherwise cast."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349

(1989).  This has been a long-standing principle reflected in the case law of this circuit:

> [t]he agency need not foresee the unforeseeable, but by the same token neither can
> it avoid drafting an impact statement simply because describing the environmental
> effects of and alternatives to a particular agency action involves some degree of
> forecasting.  And one of the functions of a NEPA statement is to indicate the
> extent to which environmental effects are essentially unknown.  It must be
> remembered that the basic thrust of an agency's responsibilities under NEPA is to
> predict the environmental effects of proposed action before the action is taken and
> those effects are fully known.  Reasonable forecasting and speculation is thus
> implicit in NEPA . . . .

*Scientists' Inst. for Pub. Info. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1092 (D.C. Cir. 1973).

The cases cited by Defendants in support of their "speculation" argument are inapposite.

Defendants cite *Kleppe v. Sierra Club*, 427 U.S. 390 (1976), and two other cases for the

proposition that "agencies are not required to evaluate impacts that are speculative."  Defs.'

Opp'n at 18.  In actuality, *Kleppe* and these other cases stand for the very different principle that

an agency need not consider environmental impacts when its own action is speculative or

hypothetical.  That is, the question in those cases was not whether the environmental impacts of a

particular action were speculative, but rather, whether the agency was, in fact, going to take a

particular action in the future.  *See, e.g.*, *Kleppe*, 427 U.S. at 408-09 (holding that an EIS was not

required where there was no evidence in the record that the agencies were contemplating a

proposal for a major federal action with respect to the region at issue).  In this case, there is no

question that the DOI has acted because the Final Rule has already been implemented.  Similarly,

Defendant cites *Glass Packaging Institute v. Regan*, 737 F.2d 1083, 1092-94 (D.C. Cir. 1984),

for the proposition that NEPA does not require consideration of environmental effects caused by

the "criminal acts of third parties."  Defs.' Opp'n at 18.  That case, however, supports the more

modest principle that an act need not be evaluated if it is not "an environmental health risk." *Id.*

at 1092.  That case did not circumscribe the well-settled rule that an agency must evaluate

foreseeable environmental impacts even if they are the result of the yet-unknown actions of third

parties:

> NEPA's impact statement procedure has been held to apply where a federal
> agency approves a lease of land to private parties, grants licenses and permits to
> private parties, or approves and funds state highway projects.  In each of these
> instances the federal agency took action affecting the environment in the sense
> that the agency made a decision which permitted some other party – private or
> governmental – to take action affecting the environment.

*Scientists' Inst. for Pub. Info.*, 481 F.2d at 1088-89.

Beyond the failure to evaluate these potential environmental impacts, the DOI's reliance

on the experiences of the BLM and the Forest Service, as well as its citation to the National

Research Council study cited in its Decision Memorandum, are inadequate.  *See* Decision Mem.

at 4.  The DOI's reference to "available data" is entirely unexplained and the Court shares

Plaintiffs' confusion as to whether the DOI was relying on the studies cited only in its Decision

Memorandum or on actual data compiled by the BLM and the Forest Service concerning how its

regulations have operated.  *See* NPCA Reply at 8 ("the only 'data' cited are . . . academic studies

. . . Plaintiffs have not found any evidence in the Final Rule or in the Administrative Record that

Defendants ever attempted to gather any relevant data from BLM or the Forest Service").

Defendants' citation to *Firearms and Violence: A Critical Review* is also puzzling.  *See* Decision Mem. at 4.  The DOI's citation refers to the conclusion that certain data does not "credibly demonstrate a causal relationship between the ownership of firearms and the causes or prevention of criminal violence or suicide."  A.R. 808 (*Firearms and Violence: A Critical Review* 6 (Charles F. Wellford et al. eds., 2004)).  The report also concludes, however, that "far less attention has been devoted to understanding the defensive and deterrent effects of firearms," *id.* – precisely the usage that is likely to occur according to the information in the Administrative Record.

Defendants' statement that "a number of academic studies and surveys demonstrate that individuals authorized to carry concealed firearms are *less likely* than the general public to commit a violent crime or engage in a personal confrontation with a firearm," reflects another misunderstanding for what the DOI should have evaluated prior to promulgating the Final Rule.  A.R. 201 (emphasis in original).  Even if the DOI's conclusion were entirely correct, it makes no difference whether persons carrying concealed weapons are more or less likely to commit crimes or engage in personal confrontations than the general public.  What *does* matter is how often such acts will occur when concealed, loaded, and operative firearms are brought into national parks and wildlife refuges, and what result such actions will have on the environment.  Stated another way, the issue as it relates to NEPA is not whether persons carrying concealed firearms will use them more often than the general public, but rather, *whether they will use them at all*.  If the firearms will be used, then the Final Rule will obviously have *some* impact on the environment, whether direct, indirect, or cumulative.  Defendants improperly ignored this environmental impact.

Given the foregoing, the Court finds that the DOI's decision to invoke a categorical

exclusion was arbitrary and capricious.[15]  Categorical exclusions are reserved for a category of agency actions that "do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect . . . ."  40 C.F.R. § 1508.4. Defendants reached their determination that the Final Rule was strictly a legal amendment with no environmental impacts only after failing to adequately evaluate all reasonably foreseeable environmental impacts, and ignoring (without sufficient explanation) substantial information in the administrative record concerning environmental impacts.  Those environmental impacts include Defendants' own long-standing beliefs under the previous regulations that such environmental impacts would occur in the absence of firearm restrictions and the almost universal view among interested parties that allowing persons to possess concealed, loaded, and operable firearms in national parks and wildlife refuges will result in the use of the firearms for self-defense or any number of other reasons.

The Court further holds, for precisely the same reasons, that the DOI also improperly determined that there were no "extraordinary circumstances in which a normally excluded action may have a significant environmental effect," thus requiring preparation of at least an EA.  40 C.F.R. § 1508.4.  In this case, the information in the administrative record makes clear that a substantial dispute exists with respect to the environmental effects of the Final Rule, and that such effects may have a significant impact on public health or safety.  *Id.* § 1508.27.

Accordingly, the Court finds that Plaintiffs have a high likelihood of success on the

---

[15] Plaintiffs also argue that Defendants violated NEPA by failing to solicit public comments for their decision to invoke a categorical exclusion.  *See* Pls.' Mot. at 16-19.  As described by Defendants, no such requirement exists in NEPA or applicable regulations.  *See* Defs.' Opp'n at 20-24.

merits of their NEPA claims.

> B.      *Plaintiffs Have Established a Likelihood of Irreparable Harm in the Absence of a Preliminary Injunction*

Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction argues that Plaintiffs cannot establish that they will suffer irreparable injury in the absence of a preliminary injunction.  *See* Defs.' Opp'n at 10-13.  This argument is premised on Defendants' assertion that "Plaintiffs obviously are speculating about potential injury," Defs.' Opp'n at 33, and "the only imaginable way [] alleged implementation difficulties could amount to an irreparable injury to Plaintiffs would be through the realization of Plaintiffs' speculation about increased illegal gun use."  Defs.' Opp'n at 34.  Defendants also argue that "Plaintiffs make no showing whatsoever that illegal gun activity or impulse killings is likely . . . As explained above, the Final Rule does not authorize 'increased gun activity,' and leaves in place all the existing prohibitions on illegal gun activity."  Defs.' Opp'n at 33 (emphasis in original omitted).

For the reasons described above, the Court has already found that the DOI misapprehended its obligations under NEPA by focusing on what the Final Rule authorized, as opposed to what environmental impacts were foreseeable.  *See*, Section III.A, *supra*.  Although a procedural violation of NEPA is not itself sufficient to establish irreparable injury, it is certainly a relevant consideration:

> [t]he NEPA duty is more than a technicality; it is an extremely important statutory requirement to serve the public and the agency *before* major federal actions occur. If plaintiffs succeed on the merits, then the lack of an adequate environmental consideration looms as a serious, immediate, and irreparable injury.  Although the *balancing* of this harm against other factors is necessarily particularized, the injury itself is clear.

*Found. on Econ. Trends*, 756 F.2d at 157 (emphasis in original; internal citations omitted).

When a procedural violation of NEPA is combined with a showing of environmental or aesthetic injury, courts have not hesitated to find a likelihood of irreparable injury. *See, e.g.*, *Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 221 (D.D.C. 2003) ("although defendants appear to be correct in their assertion that the procedural harm arising from a NEPA violation is insufficient, *standing alone*, to constitute irreparable harm justifying issuance of a preliminary injunction, when combined with the irreparable aesthetic injuries alleged by plaintiffs, such procedural harm does bolster plaintiffs' case for a preliminary injunction") (emphasis in original); *Fund for Animals v. Clark*, 27 F. Supp. 2d 8, 14 (D.D.C. 1998) ("the combination of the injury suffered by plaintiffs due to federal defendants' procedural failure to comply with NEPA and the aesthetic injury the individual plaintiffs would suffer from seeing or contemplating the bison being killed in an organized hunt leads the court to conclude that the plaintiffs have carried their burden of demonstrating the presence of an irreparable harm should the court not grant injunctive relief").

In this case, Plaintiffs have met their burden to establish a likelihood of irreparable harm by showing that the Final Rule will have *some* environmental impacts, even if the extent of those impacts are not fully known. *See* Section III.A, *supra* (describing the almost universal view in the administrative record that persons carrying the concealed, loaded, and operable firearms in national parks and wildlife refuges will use them for self-defense or otherwise); 40 C.F.R. § 1508.8 (defining environmental impacts to include "ecological, . . . aesthetic, historic, cultural, economic, social, or health," effects, "whether direct, indirect, or cumulative"). In addition, Brady has submitted declarations from several of its members indicating that they are now concerned for their personal safety in parks and refuges and cannot fully enjoy their visits to certain national parks or wildlife refuges because they feel less safe. *See* Brady Reply at 20-22 &

Exs. G-P (Brady Member Declarations).  These environmental and aesthetic injuries are

irreparable.  *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987) )

("'[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages

and is often permanent or at least of long duration, *i.e.*, irreparable'"); *Envtl. Def. v. Army Corps

of Eng'rs*, No. 04-1575, 2006 U.S. Dist. LEXIS 47969 at *25-*26 (D.D.C. Jul. 14, 2006)

("[b]ecause of the irremediable nature of many environmental claims, courts have been wary of

even relatively modest environmental harm"); *Fund for Animals*, 27 F. Supp. 2d at 14 (finding

aesthetic injury that demonstrated irreparable harm where "[a]t least one of the individual

plaintiffs has in the past traveled great distances . .. for purposes of observing the visiting with

the bison" that were the subject of the potential agency action").

 The Court also finds, contrary to Defendants' argument, that Plaintiffs' injuries are not

minimized or eliminated simply because the precise effects of the Final Rule are unknown.  *See*

Defs.' Opp'n at 33.  *See also* MSLF Opp'n at 7 (arguing that Plaintiffs "are unable to provide

evidence that the Final Rule will 'imminently' cause widespread loss of wildlife . . .").  This lack

of precision is the result of the DOI's failure to conduct an environmental evaluation prior to

promulgating the Final Rule, and it does not constitute an impediment to Plaintiffs' showing of

irreparable harm.  *See Winter*, 129 S. Ct. at 376 ("[p]art of the harm NEPA attempts to prevent in

requiring an EIS is that, without one, there may be little if any information about prospective

environmental harms and potential mitigating measures"); *Fund for Animals v. Norton*, 281 F.

Supp. 2d 209, 221 (D.D.C. 2003) ("District Court [have] found irreparable harm in . . . cases

even though plaintiffs did not establish that the exact animals they regularly observed would be

directly affected by the proposed action").[16]

Accordingly, the Court finds that Plaintiffs have met their burden to establish a likelihood of irreparable harm, even though the precise scope of that harm may not be fully known unless and until Defendants comply with the procedural obligations imposed by NEPA.

C.       *Plaintiffs Have Established that a Preliminary Injunction is Not Likely to Injure Defendants, and the Potential Harm to Other Interested Parties is Not Substantial*

Defendants do *not* argue that they will suffer any harm as a result of a Preliminary Injunction. *See generally* Defs.' Opp'n.  *See also* NPCA Reply at 22 ("Defendants have offered no explanation or argument of any harms that would befall them if an injunction issued"); Brady Reply at 22 ("Defendants have failed to show, or even assert, that they will sustain any harm whatsoever if this Court grants a preliminary injunction").

Intervenor-Defendants NRA and MSLF argue that their members will suffer injuries if a preliminary injunction issues because they want to possess concealed, loaded, and operable firearms in national parks and wildlife refuges.  *See, e.g.*, NRA Opp'n at 24 ("millions of law-abiding people [want] to exercise lawfully their rights created by state law to carry firearms on federal lands").  These injuries, however, are somewhat diminished by the uncertainty as to whether their members have such a right at all based on the Final Rule implemented by Defendants.  Neither the NRA nor MSLF present the Court with any reason as to why, after

---

[16] The Court notes that Defendants' Opposition contains a lengthy argument about who bears the burden of proving irreparable harm.  *See* Defs.' Opp'n at 33 ("Plaintiffs are confused about who bears the burden to justify a preliminary injunction.  It is Plaintiffs' burden to demonstrate injury . . .").  Defendants' argument is misguided.  Plaintiffs have only suggested that Defendants' failures under NEPA have deprived them of the ability to set forth a precise showing of the extent of environmental harm, *see* Pls.' Mot. at 38, but in no way do they suggest that Defendants bear the burden of establishing the likelihood of Plaintiffs' irreparable injuries.

operating under the firearm restrictions in the previous regulations for approximately 25 years, their members would be substantially harmed while awaiting resolution of Plaintiffs' claims on the merits and ascertainment of whether their members have the right to possess concealed, loaded, and operable firearms in national parks and wildlife refuges based on the regulations amended by the Final Rule.

Accordingly, while the Court accepts that the MSLF and the NRA's members may suffer some harm by having to wait to possess concealed, loaded, and operable firearms in national parks and wildlife refuges in accordance with the regulations amended by the Final Rule, the Court finds that this harm (which is limited in time by the pendency of these proceedings) is not substantial, and that there is no harm to Defendants themselves.

D.      *Plaintiffs Have Shown that a Preliminary Injunction Is in the Public Interest*

There is no question that the public has an interest in having Congress' mandates in NEPA carried out accurately and completely.  *See Fund for Animals*, 27 F. Supp. 2d at 15 ("the public interest expressed by Congress[] was frustrated by the federal defendants not complying with NEPA.  Therefore, the public interest would be served by having the federal defendants address the public's expressed environmental concerns, as encompassed by NEPA, by complying with NEPA's requirements.").  The public also has an interest in ensuring that the Final Rule promulgated by the DOI does not give way to unintended environmental consequences that have not (but should have) been evaluated by Defendants.  As Brady points out, a preliminary injunction will ensure that the DOI's original goals of "ensur[ing] public safety and provid[ing] maximum protection of natural resources" are not undermined by environmental impacts that have not yet been properly considered.  Brady Reply at 24 (quoting 47 Fed. Reg. at 11,602; 48

Fed. Reg. at 30,265).

Defendants have not set forth any reason as to why the Final Rule must be implemented at this time, as opposed to after a resolution on the merits of Plaintiffs' claims. *Cf. Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 237 (D.D.C. 2003) ("[defendants] have not met their burden of demonstrating why reduction of the mute swan population in Maryland *must* begin at this time in order to achieve this long-term goal, as opposed to, say, a year in the future when the next molting season takes place") (emphasis in original). Although the MSLF argues that the amorphous "constitutional guarantees of federalism" are best served by not enjoining implementation and enforcement of the Final Rule, *see* MSLF Opp'n at 22-23, the MSLF similarly does not argue that federalism cannot await resolution of Plaintiffs' claims on the merits in this case. Should Defendants ultimately prevail in this litigation, it would appear that little would have been lost, and implementation of the Final Rule (and the experiment in federalism discussed by the MSLF) could follow shortly thereafter.[17]

Having considered Plaintiffs' showing with respect to the four elements necessary to obtain preliminary injunctive relief, having conducted a balancing of the equities, and having taken into account the totality of the circumstances as a whole, the Court finds that Plaintiffs have made the necessary showing to obtain a preliminary injunction.

---

[17] The Court notes that the NRA includes certain arguments in its brief relating to the constitutional right to bear arms. *See* NRA Opp'n at 14. It is unclear whether the NRA intended to argue that the regulations in place prior to the Final Rule unconstitutionally infringe on the rights of its members. Nevertheless, the Court emphasizes that this case is not a referendum on concealed weapons laws, and the constitutionality of the regulations in place prior to the Final Rule are not before this Court.

E.        *Standing*

As a final matter, the Court shall address the issue of Plaintiffs' standing.  Although the

Court recognizes that standing is ordinarily examined as a threshold jurisdictional issue, *see*

*Raytheon Co. v. Ashborn Agencies, Ltd.*, 372 F.3d 451, 453 (D.C. Cir. 2004) ("Article III

standing must be resolved as a threshold matter"), Defendants have not challenged Plaintiffs'

standing in this case.  *See generally* Defs.' Opp'n.  Nevertheless, because Intervenor-Defendant

NRA and Amicus Curiae SCI have raised various standing arguments (albeit none that are

meritorious), the Court shall briefly consider Plaintiffs' standing.

The elements of standing are well-established.  A plaintiff must show:  (1) that it has

suffered an injury in fact, which is the invasion of a legally protected interest that is (a) concrete

and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there is a

causal connection between the injury and the conduct at issue, such that the injury is fairly

traceable to the challenged act; and (3) that it is likely, as opposed to speculative, that the injury

will be redressed by a favorable decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61

(1992).  To establish prudential standing, a plaintiff must show "only that its 'interest is arguably

one regulated or protected by the statutory provision at issue.'"  *Safe Extensions, Inc. v. Fed.*

*Aviation Admin.*, 509 F.3d 593, 600 (D.C. Cir. 2007) (internal quotation marks omitted).

Plaintiffs bear the burden of demonstrating that they have standing.  *See Lujan*, 504 U.S.

at 561 ("The party invoking federal jurisdiction bears the burden of establishing [the] elements

[of standing].").  Plaintiffs need not show that each plaintiff has standing to assert every claim;

rather, "if constitutional and prudential standing can be shown for at least one plaintiff, [the

court] need not consider the standing of the other plaintiffs to raise that claim."  *Mountain States*

*Legal Found. v. Glickman*, 92 F.3d 1228, 1221 (D.C. Cir. 1996) (citing *Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981)).

An organization (such as Plaintiffs) may assert standing on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). Even if an organization does not have members, it may still have organizational standing if it "is the functional equivalent of a traditional membership organization." *Fund Democracy LLC v. SEC*, 278 F.3d 21, 25 (D.C. Cir. 2002) (citing *Hunt*, 432 U.S. at 343-45). In such instances, a court must assess whether it functions like a "traditional membership organization" by examining whether (1) it serves a specialized segment of the community; (2) represents individuals that have all the "indicia of membership" including (i) electing the entity's leadership, (ii) serving in the entity, and (iii) financing the entity's activities; and (3) has fortunes that are tied closely to that of its constituency. *Id.*

In this case, both NPCA and Brady have easily met their burden to show organizational standing. Members of NPCA visit and enjoy national parks and wildlife refuges on a frequent basis. Pls.' Mot., Ex. A ¶ 3 (Decl. of T. Kiernan). As a direct result of the Final Rule, NPCA's members assert that they fear both for their personal safety as well as for the environment they enjoy in national parks and wildlife refuges. *Id.* ¶ 7. Brady's members visit and enjoy national parks and wildlife refuges on a frequent basis. *See, e.g.*, Brady Reply, Ex. G ¶ 3 (Decl. of S. Verge). As a direct result of the Final Rule, Brady's members assert that they feel less safe and

41

that the Final Rule has reduced their "opportunities to pursue recreational, aesthetic, and leisure activities in national park areas." *Id.* ¶ 2.  These injuries are traceable to the Final Rule, which lifted restrictions on the possession of concealed, loaded, and operable firearms, and are redressable if the restrictions are restored.  *See, e.g.*, *id.* ¶ 4 (Brady member indicating that if the Final Rule is vacated or changed, she "will once again feel safe in and fully enjoy national parks").  Based on the foregoing, the Court finds that NPCA and Brady have met their burden to demonstrate standing in this case.  *Cf. Nat'l Parks Conservation Ass'n v. Manson*, 414 F.3d 1, 4 (D.C. Cir. 2005) ("As an organization dedicated to the conversation of, and whose members make use of, public lands, [NPCA] suffers a cognizable injury from environmental damage to those lands.").

The NRA's standing argument is that Brady has failed to set forth a cognizable theory of "organizational standing" because its members "do not have the indicia of membership found significant by the [Supreme] Court" in *Hunt v. Washington Apple Advertising Commission*, 432 U.S. 333 (1977).  *See* NRA Opp'n at 21-22.  In particular, the NRA asserts that Brady's members do not have the right to elect their governing body, its articles of incorporation do not require that its directors be members, and Brady's articles of incorporation do not require the purported members to pay dues.  *Id.* at 22.

The NRA's standing argument is based upon a flawed reading of *Hunt* and specific facts concerning Brady.  The inquiry into the "indicia of membership" that occupies the NRA's focus is necessary only when an organization is not a "traditional membership organization."  *See Gettman v. High Times Magazine*, 290 F.3d 430, 435 (D.C. Cir. 2002) ("'[i]n determining whether an organization *that has no members* in the traditional sense may nonetheless assert

42

associational standing, the question is whether the organization is the functional equivalent of a

traditional membership organization'") (quoting *Fund Democracy*, 278 F.3d at 23) (emphasis

added); *Fund Democracy*, 278 F.3d at 26 (distinguishing between "members or any equivalent

affiliates").  Thus, the D.C. Circuit has explained that the plaintiff organization in *Hunt*, on

which the NRA predicates its argument, "concerned an organization that premised standing upon

the claims of *non-members*."  *Am. Legal Found. v. Fed. Commc'n Comm'n*, 808 F.2d 84, 89

(D.C. Cir. 1987) (emphasis added).

In this case, Brady submitted a declaration from the President of the organization stating

that "[t]he Brady Campaign is the nation's largest national, non-partisan, grassroots membership

organization leading the fight to prevent gun violence . . . The Brady Campaign has members in

every state of the country . . ."  Brady Mot., Ex. G ¶ 2 (Decl. of P. Helmke).  Brady also

submitted declarations from several of its members describing the effect that the Final Rule will

have on them.  *See* Brady Reply, Exs. G-P (multiple declarations submitted by Brady members).

Brady also submitted a copy of its Articles of Incorporation which state that "[t]he Corporation

[Brady] shall have members.  The members shall have voting rights as prescribed in the By-

Laws."  *Id.*, Ex. E at 3 (1/16/74 Articles of Incorporation).  Accordingly, Brady has sufficiently

established its existence as a membership organization, and the Court rejects as flawed the

NRA's assertion that it has failed to establish organizational standing.[18]

---

[18] The standing arguments raised by Amicus Curiae SCI do not require extended analysis, as they are almost entirely based on its view of the Final Rule's environmental impacts (or lack thereof), thereby implicating the precise merits-based question associated with Plaintiffs' claims. The Court declines to resolve the merits of Plaintiffs' claims in the context of standing. "[T]hough the trial court may rule on disputed jurisdictional facts at any time, if they are inextricably intertwined with the merits of the case it should usually defer its jurisdictional decision until the merits are heard." *Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192, 198 (D.C.

**IV.  CONCLUSION**

For the reasons set forth above, the Court shall GRANT Plaintiffs' Motion for a

Preliminary Injunction.  Defendants shall be enjoined from implementing or enforcing the Final

Rule published in the Federal Register on December 10, 2008, that amends 36 C.F.R. § 2.4 and

50 C.F.R. § 27.42 (located at 73 Fed. Reg. 74,966-74,972), to allow persons to "possess, carry,

and transport concealed, loaded, and operable firearms within a [national park or national

wildlife refuge] in accordance with the laws of the state in which the [national park or national

wildlife refuge], or that portion thereof, is located, except as otherwise prohibited by applicable

Federal law."  An appropriate Order accompanies this Memorandum Opinion.

Date: March 19, 2009

_____/s/_____

**COLLEEN KOLLAR-KOTELLY**
United States District Judge

_____

Cir. 1992).